## Iva Shaw, and Edward Shaw, Sr. et al., Appellees, v. Swift and Company, Appellant.

Gen. No. 45,983.

Opinion filed June 8, 1953. Released for publication September 16, 1953.

MAYER, MEYER, AUSTRIAN & PLATT, of Chicago, for appellant; H. TEMPLETON BROWN, and JACOB X. SCHWARTZ, both of Chicago, of counsel.

PHILIP H. CORBOY, of Chicago, for appellees.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

The plaintiffs Iva Shaw and Edward Shaw, Sr., husband and wife, five of their minor children by Edward Shaw, Sr., their next friend, and Edward Shaw, Sr., as the administrator of the estate of Beverly Shaw, deceased, brought suit to recover damages for illnesses and one death alleged to have resulted from the consumption of chitterlings, a pork product, claiming that defendant Swift and Company sold the chitterlings to Altgeld Gardens Consumer Cooperative, Inc., a retail grocery store, which in turn sold them to plaintiff Iva Shaw. Altgeld Gardens, originally also named as a defendant, was dismissed upon motion of the plaintiffs at the close of the evidence offered on their behalf, and a sixth child, Gilbert Shaw, who was also originally named as a plaintiff, withdrew during the trial of the case. The case was tried by a jury. Motions by the

defendant for directed verdicts at the close of plaintiffs' evidence, and at the close of all the evidence, were denied. Separate verdicts were returned in favor of the administrator of the estate of Beverly Shaw, deceased, in the amount of $15,000, and in favor of the other plaintiffs in amounts ranging from $500 to $1,000. Thereafter, motion for judgments notwithstanding the verdict was denied, and judgments were entered on each of the verdicts, from which defendant appeals.

The essential facts disclose that on November 22, 1947 Mrs. Shaw purchased ten pounds of frozen chitterlings from Altgeld Gardens, a retail grocery store; at the same time, she purchased a quantity of hog maw. Chitterling is the wall of the large intestine of a hog, and hog maw is the outer lining of the stomach.

At least two packers sold chitterlings to Altgeld Gardens on or near the date of the alleged purchase. Chitterlings were sold and delivered by Roseland Market, a so-called branch house operated by defendant in Chicago, to Altgeld Gardens both before November 22 and also on November 24, 1947. The chitterlings were obtained by Roseland Market from Iowa Packing Company, a division of Swift and Company located at Des Moines, Iowa. Hog maw was sold by Russell Packing Company to Altgeld Gardens on November 19, 1947. Both hog maw and chitterlings were sold by Russell Packing Company on November 24, 1947.

Mrs. Shaw testified that the chitterlings purchased by her were sealed in a paper carton which bore the name of Swift and Company; that they were hollow, in the form of a collapsed tube, and between one to three feet in length. Defendant's evidence showed that all chitterlings processed by the Iowa Packing Company and sold by Altgeld Gardens were split open. A dish prepared from chitterlings and hog maw was a

137

favorite one with the Shaw family, and those purchased were to be the main item on the family's Sunday dinner that week. Mrs. Shaw commenced to prepare them as soon as she returned to her home. Both products were cut into strips of from three to four inches in length and one inch in width. The thickness of a chitterling when split is one-eighth inch; pieces of hog maw are thicker. All the pieces of both products were mixed together and placed in a large kettle of ten-to-twelve quart capacity. Enough water was put into the kettle to cover the entire mixture, and a lid was placed over the kettle and the water brought to a boil. The mixture was allowed to boil for about five hours, or until approximately one o'clock Sunday morning. They were then allowed to cool and were again placed on the stove around noon on Sunday and permitted to simmer for another four or five hours. Mr. Shaw ate some of the chitterlings and maw for breakfast between eleven and twelve o'clock Sunday morning. All the Shaw family also ate some at the afternoon meal which was served about five o'clock on Sunday, and again on Monday it was served for dinner which was eaten about six o'clock. At both meals everyone also had spaghetti, bread and either butter or margarine; all had a dry cereal for breakfast.

Mrs. Shaw testified that the first member of the family to become sick was Anthony who showed signs of illness about one o'clock Tuesday morning and was taken to the hospital Tuesday evening. However, the hospital records show that Anthony was not admitted until Thursday, November 27, 1947. Mrs. Shaw stated that she became sick on Wednesday, but that none of the other members of the family became ill until Friday. On Saturday Albert, Ralph and Herbert were taken to the hospital, and Beverly became ill that afternoon. She and Mrs. Shaw went to the hospital on Sun-

138

day, and Gilbert and Edward, Jr., were admitted on Monday. Mrs. Shaw was not hospitalized at that time. Beverly, who was five years old, died on Sunday, December 1, 1947. The other members of the family were discharged on or before December 16, 1947. The hospital records show a diagnosis of bacillary dysentery, Shigella Flexner type, for each member of the Shaw family who was admitted as a patient, including Gilbert; they further show, in his case, that Shigella was isolated from his stools on December 3, 1947, but not on later dates. Both Mr. and Mrs. Shaw testified that Gilbert did not eat hog maw or chitterlings, although the original complaint alleged that he was made ill by them.

There was considerable medical testimony as to the habits and proclivities of Shigella Flexner which was described as an organism that is found and may live only in man or in the primates; it is not found in the intestinal tract of a hog. Shigella breeds in the intestinal tract. In general, man himself spreads the organism through the use of common sanitary facilities. However, flies may carry the organism from one person to another; cutlery or china can become contaminated and serve as a carrier with equal ease; there is evidence that any food product may become contaminated if Shigella is deposited on it. Shigella upon man or any other contaminated object gives no external evidence of its presence; it cannot be seen, it does not affect the taste of any food product, nor does it produce an odor.

Bacteriologists, testifying on behalf of defendant, stated that the disease which Shigella produces in a person is known as bacillary dysentery, more commonly called intestinal flu, and causes an inflammation of the bowel lining. One of the most common of the resulting symptoms is diarrhea. There is a variable pe-

riod of incubation, estimated to be from several hours to seven days, between the time when living Shigella has been carried into the human system and the illness which may or may not result. The same exposure, for example, may produce bacillary dysentery in six persons and not affect a seventh. Neither are the attending symptoms constant. The presence of Shigella in the human system may or may not be shown by means of a stool culture, and a person may have bacillary dysentery as determined by culture of his stool and at the same time have no diarrhea, fever, prostration, headache or other symptomatic evidences of illness.

The only bacteriologist called on behalf of plaintiffs was Milton Goldin. In reply to hypothetical questions he indicated that in his opinion it was possible, though not probable, that plaintiffs' illnesses were connected with the consumption of chitterlings, and that the possibility was a remote one. He stated that where people live under crowded conditions and use the same sanitary facilities, bacillary dysentery is frequently found in epidemic form.

Dr. Gail M. Dack, professor of bacteriology at the University of Chicago and director of the Food Research Institute, testified that chitterlings prepared and cooked in the manner described by Mrs. Shaw could not produce bacillary dysentery, unless they became contaminated after they were cooked. Dr. Lloyd B. Jensen, author, teacher, and presently chief bacteriologist of defendant's research laboratory, stated that not only Shigella but any other organism which might enter a human being would be destroyed if present on chitterlings cooked in the manner described by Mrs. Shaw, and that it would be impossible for food so cooked to transmit bacillary dysentery to a person eating it.

In order to establish a cause of action, either on the theory of a tort or a warranty, it was incumbent upon plaintiffs to prove that the product of defendant bore the bacteria and caused the illnesses of plaintiffs. There is no evidence purporting to indicate in what way defendant was negligent in processing, handling or inspecting chitterlings sold by it. All the operations of the Iowa Packing Company, where the chitterlings sold by defendant to Altgeld Gardens were processed, were under the constant supervision of the Meat Inspection Division of the United States Department of Agriculture. Dr. Charles L. Ury, the acting supervisor in charge of that work, testified that he had four veterinarians and fourteen laymen working under him; that all hog viscera were inspected by them at various processing stages; that the purpose and function of the federal inspection division is to ascertain that all products leaving the plant are sound, healthful and otherwise fit to be used as food.

The division superintendent of the Iowa Packing Company stated that in the fourteen years during which he had held that position, no complaint had ever been received with respect to any of the chitterlings which that plant had processed, and that over a half-million pounds were sold each year. Herbert P. Adler, in general charge of all defendant's pork operations, gave substantially the same testimony.

It is not disputed that the senior Shaws and the children suffered from bacillary dysentery, commonly called intestinal flu, but there is no evidence from which the jury could have logically found a causal connection between their illnesses and the chitterlings processed or sold by defendant. The record contains extensive evidence as to Shigella Flexner and the illness which it can produce. It enters the intestinal tract

and multiplies there to the point where the lining of the intestines becomes inflamed. Diarrhea is the most common symptom of this condition; fever, headache and prostration may be other symptoms. It was shown upon trial that Shigella passes from man to man and does not incubate in animals or in other media. It passes from man in his stools and may contaminate sanitary facilities or anything else with which it comes in contact. A person bearing Shigella on his hands or on other parts of his body may contaminate any object, animate or inanimate, which he touches, and a second person touching the contaminated object may himself then become a carrier. Once lodged within the human system, Shigella may produce illness within a period as short as a few hours or as extended as a week.

There is force to defendant's contention that it was a capricious choice on the part of plaintiffs to single out the chitterlings as the probable cause of their illnesses, considering all the foods eaten by them in the week preceding their illnesses, and all the persons and objects with whom and with which they came into contact during that period; there is no evidence to sustain this contention. In an effort to show a causal connection between their illnesses and the chitterlings, plaintiffs proceed on the assumption that, since they all ate chitterlings, all became ill, and chitterlings could become contaminated if they came into contact with another object or person, all these facts, taken together, should be sufficient to permit a jury to infer that the chitterlings sold to Altgeld Gardens were contaminated at the time of the sale in question and were the cause of the illnesses complained of. Plaintiffs' counsel argues that it was unnecessary for him to prove the presence of Shigella Flexner upon the chitterlings other than by derivative proof of the fact that plaintiffs became sick some time after eating them. This of

142

course does not take into consideration the circumstance that there were many equally probable or even more likely explanations for what occurred. It is just as fair to assume, within the framework of the medical testimony offered, that any one of the senior Shaws or the Shaw children might have been the source of the common illness by carrying Shigella upon his or her hands and have thus contaminated the tableware, drinking glasses, towels, wash bowls or toilet facilities used by all members of the family. Furthermore, various other foods eaten by plaintiffs could have become contaminated to the same extent as contamination was possible in the case of the chitterlings; they all ate spaghetti, bread, margarine or butter. Lastly, it should be noted that the chitterlings to which plaintiffs seek to attribute their illnesses were cooked as part of a mixed dish consisting of both chitterlings and hog maw. Both products were cut into strips of the same size, the chitterlings being of a much thinner texture. Since all these pieces of meat were cooked together in the same kettle, Milton Goldin conceded that heat from boiling water would penetrate more rapidly into whatever pieces of meat were the smaller, and therefore if Shigella was found in this mixture after it was cooked, it is apparent, on the basis of his testimony, that it is likely that hog maw would be a more probable carrier than would be the chitterlings; and it is conceded that the hog maw is not a Swift product.

█ The law is well settled that " 'an inference of negligence must be based upon something other than mere conjecture or speculation, and it is not sufficient to introduce evidence of a state of facts simply consistent with or indicating a mere possibility, or which suggests with equal force and leaves fully as reasonable an inference of the non-existence of negligence. The inference of negligence must be the more probable and

more reasonable inference to be drawn from the evidence.' " *Safeway Stores v. Fuller,* 189 Okla. 556, 118 P. (2d) 649, quoting from *Lawson v. Anderson & Kerr Drilling Co.,* 184 Okla. 107, 84 P. (2d) 1104.

*Walraven v. Sprague, Warner & Co.,* 235 Wis. 259, 292 N. W. 883, is precisely in point. In that case a customer purchased a can of tuna fish and one of crab meat which were packed and sold by defendant and used, together with a number of other ingredients, in the preparation of a salad served to six adult guests who became ill within a few hours. An expert witness, testifying as a bacteriologist and a physician, gave it as his opinion that the illnesses were caused by eating crab meat and tuna fish contaminated prior to their being used in the salad. The court reversed the judgment entered in favor of plaintiff and pertinently observed that "the contamination or toxins which were in the salad could have come from several other sources than the fish or crab meat or the cans. Such ingredients in the salad as celery, mayonnaise dressing and macaroni, and knives, spoons, dishes and hands used in preparing the salad, are known to be not sterile, but actually harbor bacteria which cause human ailments. . . . This court has held repeatedly that 'a jury cannot properly be allowed to determine disputed questions of fact from mere conjecture. There must be some direct evidence of the fact, or evidence tending to establish circumstances from which a jury would be warranted in saying that the inferences therefrom clearly preponderate in favor of the existence of the fact, else the question should not go to the jury for determination at all.' " (Quoting from *Hyer v. City of Janesville,* 101 Wis. 371.)

After careful consideration of the entire record we have reached the conclusion that there is no evidence which can serve as a basis for the verdicts which

144

are predicated upon speculation or conjecture and have no probative force. In the instant case the processor sold a pork product which, so far as the evidence is concerned, was fit for human consumption when properly cooked, as these chitterlings were. The assumption of possible contamination of the chitterlings and hog maw, after they were prepared, is too broad and speculative to permit of the inference by either a court or a jury that Shigella was present in the product when it was purchased. Since plaintiffs failed to prove the charges in their amended complaint, the court should have allowed defendant's motions for directed verdicts or for judgments notwithstanding the verdicts; for failure so to do, the judgments are reversed and the cause remanded with directions that judgments notwithstanding the verdicts be entered in favor of defendant.

*Judgments reversed and cause remanded with directions.*

NIEMEYER and BURKE, JJ., concur.