Clara T. Tiffin, Administrator of the Estate of Gail Tiffin, Deceased, Clara T. Tiffin, Thomas O. Tiffin and Viva Tiffin, Plaintiffs-Appellees, v. The Great Atlantic and Pacific Tea Company, and Armour and Company, Defendants-Appellants.

Gen. No. 10,195.

Third District.
February 17, 1959.
Released for publication March 5, 1959.

Omer Poos, of Hillsboro, and Kinder & Dey, of Litchfield and E. G. Robbins, of Chicago, for defendants-appellants.

John Alan Appleman, of Urbana, and N. E. Hutson, of Monticello, for appellees.

JUDGE CARROLL delivered the opinion of the court.

In this action plaintiff, Clara T. Tiffin, as Administrator of the estate of Gail Tiffin, deceased, claims damages for the death of her intestate alleged to have been caused by eating ham purchased from the defendant, The Great Atlantic and Pacific Tea Company and which had been sold to the latter by the defendant, Armour and Company. The other plaintiffs seek damages for illness allegedly resulting from the same cause. For convenience, the defendants will be referred to as A. & P. and Armour.

The case was tried by a jury and resulted in verdicts for plaintiffs against the defendants jointly in the following amounts: Clara T. Tiffin, as Administrator of the estate of Gail Tiffin, deceased, $10,000; Clara T. Tiffin, individually, $1,000; Thomas O. Tiffin, $250; Viva Tiffin, $250. Thereafter post-trial motions were denied and joint judgments entered on the verdicts from which defendants appeal.

The pertinent allegations of the complaint are in substance that the defendant, A. & P. on June 11, 1953 was engaged in the business of selling foods and meats at retail in Litchfield, Illinois, and in the prosecution of said business, operated a store to which it invited the public as patrons; that said defendant then and there warranted to its patrons that all meats and foods sold to its patrons were good, sound, healthful, wholesome food and fit for human consumption; that on the aforesaid date, plaintiff, Clara T. Tiffin, relying upon the

423

warranty of defendant, purchased and received from defendant an "Armour's Star Tenderized Ham" for consumption by herself, her family and relatives; that defendant warranted said ham to be good, sound and wholesome food and fit for human consumption; that said ham was not as warranted but was infected with disease, contained spoiled portions of meat and was wholly unfit for human consumption; that on June 12, 1953 plaintiff cooked said ham; that on June 13, 1953 some of said ham was eaten by plaintiff, her family and relatives; that as the result of eating said ham, Gail Tiffin became sick and died on June 17, 1953; that on June 13, 1953 plaintiffs, Clara T. Tiffin, Thomas O. Tiffin and Viva Tiffin also ate some of said ham and as the result thereof each of them became ill; that defendant Armour on June 11, 1953 and for several years prior thereto was engaged in the business of slaughtering hogs, curing hams and selling same to retail dealers for resale to the public for human consumption; that on said date or within 30 days prior thereto, a quantity of ham was sold and delivered to A. & P. for resale; that Armour impliedly warranted to the ultimate consumer that said ham was wholesome food and fit for human consumption and that Clara T. Tiffin relying upon the warranty of Armour, purchased an "Armour's Star Tenderized Ham" for consumption by herself and her family. There are further allegations as to the consumption of the ham and results ensuing which are the same as those made against A. & P.

Originally the complaint included counts based upon negligence of both defendants but these were dismissed by plaintiffs at the time of trial.

The answer of A. & P. denied violation of the implied warranty and alleged that the ham was reasonably safe for human consumption as food; that it was not spoiled at the time of sale. The answer of Armour likewise denied any breach of the implied warranty.

The evidence shows that on June 11, 1953, Clara T. Tiffin purchased the alleged poisonous ham from the A. & P. store in Litchfield; that when purchased the ham was in an open refrigerator and was wrapped in paper; that the clerk took the ham to the back of the store to trim it for her and when it was returned, it was wrapped in paper; that she placed the ham in her automobile; that after stopping at her home in Walshville, she took the ham to the home of Mrs. C. L. Osborn, who lived seven miles from the Tiffin home; that at about 1:00 o'clock P. M. on June 11, 1953, Mrs. Osborn unwrapped the ham and put it in her refrigerator where it remained until 5:00 o'clock the next morning when she placed it in a gas oven to cook; that the ham cooked for 5 hours at a temperature of 325 to 350 degrees Fahrenheit; that at 11:30 A. M. the witness took the ham from the oven and set it on the stove; that the ham appeared to her to be "perfectly done" and was pulling from the bone; that at about 12:30 P. M. on that day the ham was taken in the oven roaster to the Albert Tiffin home in Walshville where it was permitted to cool at room temperature until 5:00 P. M.; that the average air temperature that day was 79 to 96 degrees; that at 5:00 P. M. Thomas O. Tiffin sliced some of the ham for an evening meal; that these slices were taken from the butt end of the ham but the cutting extended to the bone; that at this evening meal, 7 persons including the deceased and Clara T. Tiffin partook of the ham; that none of these persons suffered any ill effects therefrom; that following this meal, the ham which was in the roaster was covered and placed in an electric refrigerator; that at about 8:00 o'clock the next morning it was taken from the refrigerator and Thomas O. Tiffin sliced a portion of it for the noonday meal; that these slices were placed on two clean platters, covered with wax paper and put in the refrigerator before 9:00 o'clock A. M.; that at

about 11:30 A. M. on that day the slices of ham were served buffet style with other foods, including chicken, cottage cheese, fruit jello salad, green beans, potato salad, tossed salad, cake, coffee and ice tea; that Gail Tiffin, deceased, and plaintiffs partook of this meal and each ate some of the ham; that in addition to the ham, Gail Tiffin ate potato salad, fruit salad, cake, ice tea and cottage cheese; Thomas O. Tiffin ate green beans, tossed salad, jello salad and ice tea; Viva Tiffin ate green beans, tossed salad and coffee; Clara T. Tiffin ate tossed salad, fruit salad and coffee; that all persons who handled the food served said their hands were clean, none were ill or had colds or cuts on their hands; that the home where the meal was served was clean; that no flies came in contact with the food; that the Albert Tiffin house was located on a 278 acre farm; that the barn was located 300 feet from the house and used for cattle, hogs and milk cows; that the milk and cream used in the Tiffin house was from these cows and was not pasteurized; that the house had toilet facilities with sewage going into a septic tank 15 or 20 feet from the house; that within 2 or 3 hours after the noon meal, Thomas O. Tiffin, Gail Tiffin and Viva Tiffin became ill and at about 1:00 A. M. on June 14, Clara T. Tiffin also became ill; that the symptoms of each case were nausea, diarrhea and vomiting; that Doctor Frank B. Warner attended these persons and diagnosed their illness as food poisoning; that Gail Tiffin was taken to the hospital and died on June 17, 1953; that Dr. Warner performed an autopsy on the body of Gail Tiffin; that he took samples of tissue from the organs, prepared slides therefrom and sent them for diagnosis to the Decatur & Macon County Hospital; that Dr. George McClure, Pathologist for the hospital sent his written report on findings to Dr. Warner; that in his report, which was introduced in evidence, Dr. McClure stated that from his examination

of the slides he found no evidence for a diagnosis of fatal gastro-enteritis; that Doctor Max Appel, a pathologist, testified that he examined the slides made at the autopsy on the body of the deceased and based upon such examination, gave an opinion that the death of Gail Tiffin was caused by an overwhelming toxemia, which he explained means a flooding of the blood stream with toxins; that toxin referred to a noxious substance of a special nature which might be found in the living organism; that the most common cause of such toxins is bacterial infections; and that bacterial infections resulting from hemolytic staphylococci fall in that category; that the slides indicated to him manifestation of toxemia in the tissues evidenced by degeneration of cell structure. The trial court refused to permit this witness to give his opinion as to the cause of such toxemia.

The evidence further shows that on June 14, 1953, Willis L. Whitlock, Sanitarian of the Montgomery County Health Department, went to the Tiffin residence and collected samples of the ham and cottage cheese which were in a refrigerator and had been left over from the preceding day's luncheon; that no showing was made as to when the left-over food, including the ham slices, were placed in the refrigerator following the luncheon on June 13, 1953; that he took two slices of the ham and some of the cottage cheese and placed the same in separate sterile bottles; that samples of the other foods served at the luncheon were not taken; that the samples of cheese and ham were taken to Hillsboro and placed in a refrigerator; that the following morning they were mailed to the State Health Department in Springfield; that on June 17, 1953, Roscoe Brooks, Bacteriologist for the State Health Department ran tests on the samples of cheese and ham; that from these tests he concluded that hemolytic staphylococcus was present on the ham but none was

present on the cheese; that Brooks did not know whether the ham sample which he tested had been kept under refrigeration prior to his examination thereof; that while the sample was enroute by mail from Hillsboro to Springfield, a period of at least 24 hours, it was out of refrigeration; and that a written report of the test on the sample was submitted to the Montgomery County Health Department. This report stated that hemolytic staphylococci were present on the baked ham sample. The trial court refused to admit this report in evidence because of the remoteness of the laboratory examination.

The evidence further shows that the ham in question was processed by Armour and delivered as part of a large shipment to A. & P. on June 4, 1953. Witnesses for Armour detailed at considerable length the various steps involved in the processing of hams, including slaughtering of the live animal, cooling, cutting, smoking, refrigeration and wrapping and that these operations were made under the constant inspection of the Meat Inspection Branch of the United States Department of Agriculture. There is evidence that this shipment of hams was delivered to A. & P. in a refrigerated truck; that its employee inspected the shipment upon delivery; that his inspection consisted of spot checking the hams for internal temperature with a thermometer and also for moisture, mold and fat content, this latter operation was done by pressing the fat with the thumbs; that the hams while in A. & P.'s possession were kept under refrigeration at a temperature not exceeding 42 degrees Fahrenheit; that there was nothing unusual about the appearance and smell of the particular ham sold to Clara T. Tiffin and that A. & P. had no complaints as to the other hams received in the shipment from Armour.

The record also contains a considerable amount of expert testimony concerning the bacteria designated as

staphylococcus. Testifying for plaintiffs on this subject was Doctor Appel, who is a physician specializing in pathology. Doctor Gail M. Dack, Professor of Microbiology and Director of the Food Research Institute and one of the scientists who discovered the connection between enterotoxins of certain staphylococci and food poisoning, and M. L. Laing, Chief Chemist and Bacteriologist for Armour testified for defendants. All of these witnesses seem to agree that staphylococcus is a common microscopic organism of which there are a number of types; that a limited group thereof cause food poisoning; that it is abundant in nature and is found almost everywhere, including the air and on the bodies of human beings; that the organisms themselves are non-poisonous; that as they grow and multiply in a food, they elaborate a poison which is called enterotoxin; that it is this enterotoxin which causes food poisoning; and that staphylococcus does not grow and produce toxins at a temperature below 55 degrees Fahrenheit nor at a temperature above 105 degrees Fahrenheit, but remains dormant.

The witness Laing in answer to a hypothetical question setting out all of the conditions under which the ham was processed by Armour, the manner in which it was handled by A. & P. prior to its sale, and which also cited the manner in which plaintiffs handled the ham subsequent to its purchase until eaten by the 7 persons on the evening of June 12, stated that in his opinion there was no opportunity during the period covered for staphylococci to grow and to elaborate enterotoxin. The reasons given by the witness for his opinion were that there was neither temperature nor time sufficient for production of enterotoxin and for the further reason that no ill effects resulted from the consumption of the ham on June 12, 1953.

Doctor Dack, in answer to practically the same question as propounded to Laing, stated that in his opinion

429

there would not be multiplication and enterotoxin production in the ham while in the custody of Armour. This witness further testified that in his opinion there was no enterotoxin in the ham up to the point where it was sliced and eaten by the 7 people on June 12 for the reason that after cooking, it was essentially free from bacteria and certainly free from staphylococcus; that when handled in the kitchen there would be an opportunity for contamination but when eaten there had not been time for enterotoxin production.

Dr. Appel, in answer to a hypothetical question in which was detailed the symptoms of the illness of Gail Tiffin, the autopsy findings, the cooking and slicing of the ham, the bacteria tests made on a portion thereof and results of said tests, gave as his opinion that the death of the hypothetical person was due to an acute gastro-enteritis with a severe toxemia which is inevitably associated with it. He estimated the temperature necessary to destroy most forms of hemolytic staphylococci is 150 to 160 degrees Fahrenheit, but that to be certain that all were killed, heat from 200 to 225 degrees Fahrenheit would be required. He further stated that from examination of the slides, it was not possible to identify the toxins which actually caused the degeneration of the cell structures. The witness further stated that he regarded Dr. McClure as a competent pathologist but disagreed with the latter's opinion as to the pathology shown by the slides.

It is contended by A. & P. that as against it, plaintiffs' proof failed to establish a cause of action for food poisoning; that a causal connection between the death and illnesses complained of and the theory of food poisoning advanced by plaintiffs is not shown and that the trial court should have directed a verdict in its favor.

Plaintiffs' suit was brought on the theory of an implied warranty of wholesomeness and accordingly

430

no question of negligence is involved. Such warranty arises not from contract between seller and purchaser but has its basis in the public policy of the State, which in the interests of safeguarding the health of its inhabitants, prohibits the sale of food products which are unfit for human consumption. The general rule as applied in the case of an immediate seller of food is stated in I. L. P. Sales, Sec. 151 as follows:

"There is an implied warranty that food sold to the public is fit for consumption. The general rule, affirmed by the Uniform Sales Act, S. H. A. ch. 121½, Sec. 15, is that in a sale of food or articles for human consumption, at least where the sale is for immediate consumption, there is an implied warranty that the food is wholesome and fit for human consumption. The immediate seller makes such warranty at the time the food is purchased by the consumer, and such warranty has been held applicable to sales by retailers of goods which are canned, bottled, or in a sealed package."

It is charged in the complaint that A. & P. was guilty of a breach of its implied warranty as a retailer of foods in that the ham sold to Mrs. Tiffin was not, at the time of its sale, good, wholesome food and fit for human consumption. The burden of proving such charges rested upon plaintiffs. In order to recover they were required to prove that the ham when purchased was unfit for human consumption and caused the death and illnesses complained of. Bowman v. Woodway Stores, 345 Ill. 110; Boulahanis v. Great Atlantic and Pacific Tea Co. 348 Ill. App. 546. Essentially the evidence upon which plaintiffs depend for proof of their allegations as to the unwholesomeness of the ham when sold by A. & P. consists of the following: the testimony of Dr. Warner, who diagnosed the illness of plaintiffs as food poisoning; the testimony of Roscoe Brooks that on June 17, 1953, hemolytic staphylococcus was present on two slices of ham which were taken

431

from the Tiffin home on June 14, which was 24 hours after plaintiffs and the deceased had eaten; the opinion of Dr. Appel, based upon an examination at the time of trial of the autopsy specimens, that the death of Gail Tiffin was due to acute gastro-enteritis associated with severe toxemia; testimony showing that the ham was cooked 5 hours at an internal temperature of 212 degrees Fahrenheit in an oven where the temperature was maintained at 325 to 350 degrees Fahrenheit; that it cooled at room temperature for 6 hours; that 7 people ate some of this ham at 5:30 o'clock P. M. on June 12, which was the day after it was purchased and none of them became ill; that plaintiffs and the intestate ate some of the ham and other foods on June 13, at 11:30 A. M. and became sick from food poisoning. Obviously such evidence does not tend to prove that the ham when sold by A. & P. was contaminated and infected with disease. Moreover, the evidence that 7 people consumed a part of the ham some 30 hours after its purchase would seem to effectively refute any contention that when sold it was unfit for human consumption. Thus it would appear that plaintiffs' evidence affirmatively shows the ham to have been wholesome food and fit for human consumption long after it had left the control of A. & P. The evidence further shows that the presence of staphylococcus was first detected in the laboratory in Springfield on June 17 which was 6 days after the ham left the store of A. & P. and that during a portion of said time it had been out of refrigeration and handled by numerous persons.

The theory of Dr. Appel is that the illness of plaintiffs and the intestate was caused by a toxin thrown off by the growth and multiplication of a type of staphylococci which produces food poisoning enterotoxins. If there was any connection between the staphylococcus discovered by Brooks and food poisoning enterotoxins, it is not shown by the evidence. Dr. Appel was unable to identify the particular toxin

which caused cell degeneration, which he claimed was shown on the autopsy slides. Furthermore, the particular type of the staphylococcus found on the samples or the toxin which they produced was not shown.

In view of the failure of plaintiffs to connect either of the defendants with the alleged contamination of the ham, the testimony of Brooks and Dr. Appel was left without foundation and we think the motion of defendants to exclude their testimony should have been allowed.

While we find no case wherein the court dealt with the subject of the proof required of a plaintiff to make out a case of staphylococcus enterotoxin food poisoning, we think the observations of the court in Bowman v. Woodway Stores, supra, are applicable to the factual situation in the instant case. In the Bowman case, the defendant conducted a retail grocery store from which plaintiff purchased a number of sealed tin cans of "Pet" brand evaporated milk. Two cans of the milk were opened and consumed during the three days succeeding their purchase and on the fourth day a third can was opened, mixed with water and used on cereal. Shortly thereafter the plaintiffs' infant son became ill and died. The jury returned a verdict for plaintiffs which was affirmed by the Appellate Court. On appeal, the Supreme Court reversed the case and held that the trial court should have instructed the jury to find the defendant not guilty and in its opinion said:

"The action in this case is based upon the alleged breach of an implied warranty on the part of the plaintiff in error that the evaporated milk, at the time of its sale to Earl Bowman, was free from poisonous matter and was fit for human consumption. . . . There can be no dispute that, to establish liability on the part of the plaintiff in error the evidence must show that the milk, at the time the can was opened, was unfit for human consumption and caused the child's illness and death." . . .

433

. . . "The burden was upon the defendant in error to establish by competent evidence the poisonous or unwholesome condition of the milk when the can was opened. Evidence of later contamination would not be responsive to the allegations of the declaration and would create no liability against the plaintiff in error.

. . . "The unwholesome condition of the milk when sold was an essential element to be proved, and the evidence failed in that respect."

A similar statement is found in Shaw v. Swift & Co., 351 Ill. App. 135 where the court said:

"In order to establish a cause of action, either on the theory of a tort or a warranty, it was incumbent upon plaintiffs to prove that the product of defendant bore the bacteria and caused the illnesses of plaintiffs. There is no evidence purporting to indicate in what way defendant was negligent in processing, handling or inspecting chitterlings sold by it."

█ From the record in the instant case we are convinced that the evidence failed to furnish the jury with facts which would warrant a reasonable inference that the ham sold by A. & P. was unfit for human consumption at the time it was delivered to Clara T. Tiffin.

In the Armour case the first question to be considered is whether there is any implied warranty between the manufacturer or processor and the ultimate consumer as to a perishable, unsealed food product not intended for immediate human consumption.

█ It appears to be the general rule that the manufacturer or processor of food products warrants to the public that its product is fit for human consumption. Such warranty is made when it leaves the control of such manufacturer or processor and runs with the sale of the article for the benefit of the consumer. Such rule is stated in 22 Am. Jur. Food, Sec. 104 as follows:

"Although there are some decisions denying recovery by a consumer from a manufacturer for injuries

from food or beverages purchased through the medium of a retail dealer, the decided weight of authority is to the effect that an ultimate consumer who purchases, from a retailer or middleman, food products or beverages prepared by a manufacturer or packer, such as those put up in bottles, sealed cans or sealed packages, may bring an action directly against the manufacturer or packer for injuries resulting from the use of such foods and beverages which prove to be unwholesome and unfit for human consumption, even though there is no contractual relation between the consumer and the manufacturer or packer. The superior position of the manufacturer in respect of knowledge, and opportunity for knowledge, of the contents of the cans and of the processes of manufacture seems to have strongly influenced the courts in holding him liable, irrespective of the theory upon which a particular action is based.

"Where the manufacturer puts the goods upon the market in sealed cans or packages, he in effect represents to each purchaser that the contents of each can or package are suited to the purpose for which such can or package is sold. . . ."

We think the foregoing rule makes clear the distinction between cases in which the product is marketed in a bottle, can or other sealed container and where the product is of a perishable nature and exposed to the air and handled by the retailer, the public and the consumer. There are cases holding a manufacturer liable on the theory of implied warranty where a foreign substance or object was found in the product. The rule followed in the sealed container cases is that where the evidence shows circumstances which leave no doubt but that there was an opportunity for tampering with the contents of the container, then a verdict for the manufacturer was properly directed. Sharpe v. Danville Coca-Cola Bottling Co., 9 Ill.App.2d 175. If the manufacturer of a product marketed in a sealed container is not liable where there existed a reasonable

435

opportunity for someone to contaminate the contents of such container, there would appear to be no good reason for concluding that a food processor which does not market its product in cans, bottles or sealed packages should be held to warrant the wholesomeness thereof regardless of the opportunity for its contamination after leaving the control of such processor.

██ There rested upon plaintiffs the burden of proving that the ham in question was unfit for human consumption when it left the custody and control of Armour. In the record we find no evidence bearing upon this essential element of plaintiffs' case. However, the evidence is undisputed that there was a reasonable opportunity for tampering with the ham. It was not in a sealed container but was wrapped in paper and was not intended to be eaten until cooked. It was unwrapped in the A. & P. store, trimmed by the clerk and re-wrapped. It was transported from the store to Walshville where it was cooked and after being cooked it was taken to the Tiffin home. It was there handled by a number of persons. Plaintiffs based their right to recover against Armour solely upon its implied warranty that the ham was fit for human consumption when it left its custody. We think that proof of the presence of staphylococcus on the ham discovered 6 days after it left the control of Armour must be considered far too remote to constitute evidence fairly tending to prove that the ham was contaminated when it passed into the control of the plaintiff, Clara T. Tiffin.

Upon a careful examination of the record, we are of the opinion that the trial court erred in denying the defendants' motions for directed verdicts and accordingly the judgment is reversed.

Reversed.

ROETH, P. J. and REYNOLDS, J., concur.